Case No. 24-12787

# In the United States Court of Appeals
# For the Eleventh Circuit

KEITH EDWARDS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
JERRY BLASINGAME, DECEASED

*Plaintiff-Appellee,*

v.

OFFICER J. GRUBBS, #6416,

*Defendant-Appellant,*

*and*

CITY OF ATLANTA/ATLANTA POLICE DEPT.

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA – ATLANTA DIVISION
No. 1:19-cv-2047 (Honorable Steve C. Jones)

## PLAINTIFF-APPELLEE'S RESPONSE ON APPEAL

Christopher P. Desmond (P71493)
Ven Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
Tel: (313) 324-8300
cdesmond@venjohnsonlaw.com
*Counsel for Plaintiff-Appellee*

*Keith Edwards v. J. Grubbs, et al.*, Record No. 24-12787

## CERTIFICATE OF INTERESTED PERSONS

Plaintiff-Appellee certifies that the following persons and entities have an interest in the outcome of this action:

-Atlanta Police Department

-Blasingame, Jerry Estate of (Plaintiff-Appellee)

-City of Atlanta

-Dearing Jr., James E. (Counsel for Defendant-Appellant)

-Desmond, Christopher P. (Counsel for Plaintiff-Appellee)

-Eason, Kimberly Delk (Counsel for Defendant-Appellant)

-Edwards, Keith (Plaintiff-Appellee)

-Grubbs, Jon (Defendant-Appellant)

-Hatchett, Ayanna D. (Counsel for Plaintiff-Appellee)

-Hill, Alexander J. (Counsel for Defendant-Appellant)

-Johnson, Vernon R. (Counsel for Plaintiff-Appellee)

-Jones, Steve C. (District Court Judge)

-Melton, Harold D. (Counsel for Defendant-Appellant)

-Miller, J. Stacy (Counsel for Defendant-Appellant)

-Peeler, Charles E. (Counsel for Defendant-Appellant)

-Pierre, Hermise

-Tobin, Darren M. (Counsel for Plaintiff-Appellee)

*Keith Edwards v. J. Grubbs, et al.*, Record No. 24-12787

-Waldbeser, Elizabeth P. (Counsel for Defendant-Appellant)

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

/s/ Christopher P. Desmond
*Counsel for Plaintiff-Appellee*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellee Keith Edwards, as Personal Representative of the Estate of Jerry Blasingame, deceased, respectfully requests oral argument. This appeal is highly fact-intensive, as it arises out of a nearly two week long trial that culminated in a $100 million dollar verdict in Plaintiff's favor. Oral argument will assist the Court with its understanding of the record and with its ultimate determination.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................................... C-1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................... i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

JURISDICTIONAL STATEMENT ....................................................................... 1

ISSUES PRESENTED FOR REVIEW .................................................................. 2

STATEMENT OF THE CASE ............................................................................. 3

      A.     Introduction ................................................................................. 3

      B.     The Underlying Use of Force ...................................................... 4

      C.     The Significance of the Body Worn Camera Policy Violations ........ 11

      D.     Relevant Procedural History ...................................................... 20

STANDARD OF REVIEW ................................................................................ 27

SUMMARY OF ARGUMENT ........................................................................... 27

ARGUMENT .................................................................................................. 29

      I.     The District Court did not err in denying Defendant's
           assertion of qualified immunity ................................................ 29

           A.     Defendant has waived the qualified immunity defense ............ 30

           B.     This use of force was unreasonable and excessive
                under the governing standards ................................................ 32

           C.     The use of force violated a clearly established
                constitutional right ................................................................. 37

CONCLUSION ............................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Creighton*,
    483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) ...................................31

*Ansley v. Heinrich*,
    925 F.2d 1339 (11th Cir. 1991) ...........................................................................31

*Bradley v. Benton*,
    10 F.4th 1232 (2021) ..................................... 33, 34, 35, 36, 37, 38, 39

*Cleveland v. Home Shopping Network, Inc.,*
    369 F.3d 1189 (11th Cir. 2004) ...........................................................................27

*Doe v. Celebrity Cruises, Inc*,
    394 F3d 891 (CA 11, 2004)..................................................................................27

*Graham v. Connor*,
    490 U.S. 386 (1989)........................................................................................32, 33

*Hewitt v. B.F. Goodrich Co.*,
    732 F.2d 1554 (11th Cir. 1984) ...........................................................................36

*Mitchell v. Forsyth*,
    105 S. Ct. 2806, 472 U.S. 511, 86 L. Ed. 2d 411 (1985) ...................................31

*Sanders v. Howze*,
    177 F.3d 1245 (11th Cir. 1999) ...........................................................................30

*Tennessee v. Garner*,
    471 U.S. 1 (1985)..............................................................................32, 33, 38

*Walker v. NationsBank N.A.*,
    53 F.3d 1548 (11th Cir. 1995) .......................................................................27, 37

**Statutes & Other Authorities:**

U.S. Const. amend. IV ....................................................................1, 4, 31, 32, 33, 34

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

iii

42 U.S.C. § 1983 ................................................................................1, 3

Fed. R. Civ. P. 50 ...........................................................................25, 27

Fed. R. Civ. P. 59 ................................................................................25

Fed. R. Civ. P. 59(e) ...........................................................................26

Fed. R. Civ. P. 60 ................................................................................25

Fed. R. Civ. P. 60(b) ...........................................................................24

## JURISDICTIONAL STATEMENT

**District Court:** The United States District Court for the Northern District of Georgia had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as it involves a federal question. Specifically, Plaintiff alleged that defendants violated Mr. Blasingame's Fourth Amendment rights to be free from excessive force and were therefore liable for his injuries pursuant to 42 USC § 1983.

**Court of Appeals:** This United States Court of Appeals for the Eleventh Circuit has jurisdiction over a portion of this matter pursuant to 28 USC § 1291, as the district court's entry of judgment in favor of plaintiff, followed by its order denying Defendant Grubbs's initial motion for judgment as a matter of law, was a final order that disposed of all of Plaintiff's claims in front of the district court. Plaintiff does not concede that this Court has jurisdiction over the subsequent denial of Defendant Grubbs's subsequent motion that sought remittitur, as that motion was not properly filed in the District Court where it was both untimely and filed after the Court had been divested of jurisdiction.

**Timeliness:** Defendant timely filed his notice of appeal following the issuance of the judgment by the District Court.

## <u>ISSUES PRESENTED FOR REVIEW</u>

I.    Did the District Court err in ruling that Defendant Grubbs was not entitled to qualified immunity where the evidence demonstrated that Grubbs utilized deadly force against an unarmed, nonaggressive and elderly homeless man who was not suspected of any major crime?

## STATEMENT OF THE CASE

### A. Introduction

This cause of action arises out of an unconstitutional use of force toward Plaintiff Jerry Blasingame, an elderly homeless man suspected of panhandling in the City of Atlanta. Defendant Jon Grubbs Tasered Jerry in the back, without warning, while Jerry was standing on top of a hill. The subsequent fall down that hill left Jerry with a crushed skull and a broken neck and rendered him a quadriparetic who necessitated 24 hour care until the time of his death that resulted from these injuries. Grubbs admits that Jerry was unarmed, did not pose any threat and did not act with any aggression.

Plaintiff brought suit against Officer Grubbs and his employer, the City of Atlanta. Plaintiff alleged that the customs, policies and practices of the City of Atlanta were the driving force behind Grubbs's unconstitutional conduct and that each Defendant was liable pursuant to 42 U.S.C. § 1983. Following a two-week trial, the jury agreed and returned with a verdict totaling $100 million- $60 million of the verdict was in regard to the claim of municipal liability against Atlanta and $40 million was in regard to the claim of excessive force against Grubbs. Following trial, the District Court entered judgment in favor of the City of Atlanta, voiding that portion of the jury's verdict (which Plaintiff has appealed in Case No. 24-12925). At the same time, the District Court denied Grubbs's motion for judgment as a matter

3

of law.  As will be shown below, that denial was proper.  Grubbs is not entitled to qualified immunity where the evidence overwhelmingly demonstrated that he violated Jerry's clearly established constitutional rights under the 4th Amendment.  Likewise, the District Court also properly denied Grubbs's motion for remittitur, which was not only untimely filed, but which was also wholly without merit and filed after the District Court was divested of jurisdiction by virtue of this appeal.

### B. The Underlying Use of Force

On the afternoon of July 10, 2018, Defendant Jon Grubbs and Keith Shelley were on patrol in the course of their employment with the Atlanta Police Department.  Shelley was driving the police cruiser and Grubbs was in the passenger seat.  The two were in the area of Atlanta where I-20, I-75 and I-85 converge.  At the time of these events, traffic was generally heavy, or stop and go.  As Officer Shelley described in his testimony, the two were not responding to any calls at the time.  Instead, while patrolling and while in the process of parking their cruiser in a gore area of the highway, they observed Plaintiff Jerry Blasingame.  (Tr, pp 827-828.)  The area in question is known to have a large homeless population (Tr, p 912).  Grubbs and Shelley each testified to regularly seeing the homeless and panhandlers in the general area where they saw Mr. Blasingame (Tr, pp 828-829, 912).  The record established that at the time of these events, Mr. Blasingame was a homeless man who was 65 years old.

4

Mr. Blasingame was standing on the shoulder adjacent to the left-hand lane of the highway (Tr, p 888-889).   Grubbs and Shelley did not make the same observations when they saw Mr. Blasingame.   According to Shelley, he saw Mr. Blasingame allegedly on the roadway and receiving money from a motorist (Tr, p 832, 834-835).   Grubbs, in contrast, testified that he never saw Mr. Blasingame on the roadway, never saw him approach any vehicle, interfere with traffic in any way or receive any money from any motorist (Tr, p 1046)  Nonetheless, Grubbs testified that he did not know if Mr. Blasingame was panhandling and decided to approach him to question him (Tr, p 1048).   He was not planning on arresting Mr. Blasingame (Tr, p 1049).

When Grubbs exited the police cruiser, he had to walk across lanes of traffic in order to get to the area where Mr. Blasingame was standing (Tr, p 1048) (Grubbs was equipped that day with a body worn camera.   However, there is no footage of these events as it has been proven that Grubbs turned off his camera during the encounter, which resulted in the footage of these events being erased).   As Grubbs was walking toward Mr. Blasingame, he testified that Mr. Blasingame began to run west (Tr, p 1048).   Grubbs testified that as Mr. Blasingame was running, Mr. Blasingame still never entered the roadway (Tr, p 1050).   Instead, he was running along the shoulder of the road.   On one side of Mr. Blasingame was the yellow line at the edge of the highway; on the other side was a metal guardrail.

As he was running along the shoulder, Mr. Blasingame approached the metal guardrail. In contrast to Mr. Blasingame, Defendant Grubbs was 29 years old on the day in question, was a trained police officer, a former high school track star who specialized in sprinting and he continues to regularly work out (Tr, p 904). Unsurprisingly, Grubbs was able to quickly close the gap between him and the elderly homeless man he was chasing. By the time Mr. Blasingame had made it to the guardrail, Grubbs stated that he was within 10 feet of Mr. Blasingame (Tr, p 1052). Though Grubbs testified that Mr. Blasingame was able to make it over that guardrail "very quickly," by the time that happened Grubbs had closed to within one foot of Mr. Blasingame. He stated that he was close enough that he could have touched him had he reached out. (Tr, pp 1053-1055, 1058.)

According to Grubbs, as Mr. Blasingame made it over the guardrail he swiped his arm back toward Grubbs, never making contact (Tr, p 1056). Grubbs testified that during the entire course of the events described here, Mr. Blasingame was not armed, did not act aggressively or threateningly and never said a word (Tr, pp 1065, 1069-1070) He stated that he was not in fear of Mr. Blasingame. Nonetheless, as Mr. Blasingame made it over the guardrail, Grubbs drew his Taser (Tr, p 1062). By this point in the events, Officer Shelley had lost sight of the two men and did not see what occurred (Tr, p 849).

6

When Mr. Blasingame crossed the guardrail, he entered a path that was in an area overgrown with shrubs, trees and other vegetation (Tr, p 1056). Importantly, there was a decline on the path that led downhill (Tr, p 536). Grubbs's testimony at trial left no doubt that he understood the nature of the terrain that Mr. Blasingame was now on:

> **Q.** You knew as you deployed, of course, that you were on an elevated surface; correct?
>
> **A.** Yes.
>
> **Q.** You knew he was running away from you; correct?
>
> **A.** Yes.
>
> **Q.** So and running downhill; right?
>
> **A.** Yes. (Tr, p 1074)

According to Grubbs, without crossing over the guardrail that Mr. Blasingame crossed, he deployed his taser and the probes successfully entered Mr. Blasingame's back (Tr, pp 1071-1072). In contrast, Plaintiff introduced testimony from a police procedures expert who each testified that Grubbs *did* cross over that guardrail and proceed down a portion of the path before he fired his taser (Tr, pp 520-521). While Grubbs made it clear that Mr. Blasingame never posed a threat to him, he testified that he feared that Mr. Blasingame would run into traffic on an adjacent road if he continued to run. It was that alleged fear that served as the sole basis for the decision to deploy his Taser. Yet, Grubbs acknowledged at trial that he never saw Jerry enter

7

*any* roadway that day. Further, he acknowledged that there was no evidence Mr. Blasingame ever *would* have done so:

> **Q.** Officer Grubbs, in this case, you have no evidence that Jerry Blasingame would have run into the roadway, do you? Yes or no?
>
> **A.** No. (Tr, p 1071)

When the 50,000 volts of electricity from the Taser entered Mr. Blasingame, he lost control of his muscles and fell forward. Because he and Grubbs were on elevated ground, he ultimately fell down the hill. At the bottom of the hill, there was a concrete platform supporting a traffic control box (Tr, p 538-539). Mr. Blasingame struck his head on that concrete platform. The result was catastrophic. Mr. Blasingame suffered fractures throughout his face and skull. The left side of his skull was crushed and pushed in toward his brain, causing a traumatic brain injury. (Tr, pp 1274-1277). The force of his head snapping back also caused his neck to break in the area of his C3-C5 vertebrae (Tr, p 1280). As a result of Grubbs's unannounced use of force, Mr. Blasingame was rendered a quadriparetic who, apart from certain minimal movements and spasms, is entirely paralyzed below the neck (Tr, p 1344).

The evidence at trial proved that Grubbs violated numerous policies and aspects of his training relative to the deployment of his Taser. Grubbs admitted at trial that he was trained to yell "Taser! Taser! Taser!" at a subject before firing his Taser. That warning is designed to provide a subject with an opportunity to comply

8

or surrender before the Taser is used Grubbs fully admits, however, that he gave no such warning in this case. (Tr, p 1067.) In addition, Grubbs was trained to not use his Taser on the elderly or frail absent exigent circumstances. He was likewise trained not to use his Taser on subjects who were running or who were on elevated ground. (Tr, pp 361, 365, 873-874.)

Michael Banja is a senior officer with the Atlanta Police Department and has been a certified Taser trainer since 2012 (Tr, p 308). Banja explained that when a Taser is successfully deployed, it delivers a charge of electricity for five seconds (Tr, p 335). That charge is intended to result in neuromuscular incapacitation that causes an uncontrolled fall. Because that fall is uncontrolled, the subject does not have an ability to brace or protect themselves. Consequently, even though a Taser is considered to be "less lethal" (as opposed to "less *than* lethal"), it can still be considered a deadly weapon (Tr, p 621). Thus, Banja testified that the Department's Standard Operating Procedures specifically provide that officers "shall not" use their Tasers on subjects that are actively running from officers, nor on the elderly or physically frail (Tr, p 384). Mr. Blasingame was all three.

Atlanta's Standard Operating Procedures similarly provide that "Environmental factors which could lead to serious injury or death shall be taken into considerations" prior to deploying a Taser. (Tr, p 380) Consistent with that

policy, officers are trained to consider the landing zone of subjects before using a Taser:

> **Q.** So in other words, you teach your officers like Officer Grubbs that folks can be seriously injured, or even die, depending on how they fall and, more importantly, how they land?
>
> **A.** Yes.
>
> **Q.** I take it you teach them to be cognizant of, again, where someone is going to fall?
>
> **A.** When practical, we teach to be cognizant of where someone is going to fall. (Tr, p 370)

Grubbs admitted at trial that he was trained to predict landing zones and anticipate where someone may fall before using his Taser, and he testified that you do not want a subject falling in a landing zone you cannot see (Tr, p 927-928). Yet, he likewise testified that while he knew Mr. Blasingame was running downhill, he could not see what was at the bottom of that decline and was thus unaware of the metal box on which Mr. Blasingame landed (Tr, p 1089).

Plaintiff's two police procedures experts, Dr. Andrew Scott and Thomas Tiderington, also each testified regarding the use of force. As Mr. Tiderington opined, Grubbs did not have probable cause to arrest Mr. Blasingame as he did not see him commit any crime (Tr, p 1125). Thus, when Mr. Blasingame began to run, Grubbs did not have justification to utilize his Taser as Mr. Blasingame was within his right to leave (Tr, pp 1126-1127). Dr. Scott agreed (Tr, p 459). Further, each

10

expert explained that Grubbs violated numerous policies relating to tasing Mr. Blasingame while he was elderly, running, on elevated ground and where Grubbs did not have knowledge of the landing zone (Tr, pp 516-517, 1147-1148).  They left no doubt that the force used in this case, under these circumstances, amounted to deadly force that was constitutionally prohibited (Tr, pp 622, 1147-1148).

As is stated above, the injuries to Mr. Blasingame were catastrophic.  He was taken via ambulance from the scene to Grady Hospital in Atlanta.  While at Grady, he was considered to be in detention and in the custody of the City of Atlanta. Officer Grubbs testified that Mr. Blasingame was in custody the moment that the taser prongs entered his back (Tr, p 1079-1080).  Atlanta further demonstrated that Mr. Blasingame was in custody by serving him with two different citations in September 2018, while he was in Grady Hospital, which stated that Mr. Blasingame was currently located in "Grady Detention."  (Tr, p 558).

### C. The Significance of the Body Worn Camera Policy Violations

Just as the record shows that Grubbs did not comply with his training relative to the use of his Taser, so too does it show that he violated policy and training relative to his body worn camera.  While the evidence regarding those policy violations is perhaps of more relevance to Plaintiff's appeal relative to the municipal liability claims against the City of Atlanta, Grubbs's conscious destruction of evidence is

relevant to the present appeal because it lends insight into his awareness of his culpability following these events.

The camera Grubbs was wearing that day had a toggle switch that controlled whether the camera was powered on or off. If the camera was toggled off, it was not functional. When the camera was toggled to the on position, it would operate in what is known as buffering mode. While in buffering mode, the camera records constantly. However, it records over the previously recorded footage every two minutes. (Tr, pp 172-176.)

The camera also features what is known as an event button, which is a separate button that gets pressed instead of toggled. When a camera is on and in buffering mode, pressing the event button twice activates recording mode. In that mode, the footage records until the event button is pressed again and does not record over the footage that had been recorded in buffer mode. In fact, by pressing the event button twice, the two minutes of footage that had been recorded in buffer mode is maintained and forms the beginning of the available video footage. Lastly, and of much importance, if an officer's camera is in buffering mode and then the camera is toggled off, the footage that had been recorded in buffer mode is deleted. (Tr, pp 175-179.) Numerous employees of the Atlanta Police Department testified that Grubbs had been trained that toggling his camera to the off position would delete the

12

footage that had been stored in buffering mode. Grubbs and Shelley each testified that they never received any such training on that fact. (Tr, pp 822, 915.)

Atlanta police officers are required to keep their cameras toggled on and in buffering mode at all times. When an officer begins to interact with a member of the public or anticipates an interaction, they are trained to hit the event button twice to begin recording. When that event ends, they may hit the event button again and return to buffer mode. It appears that there are no scenarios in which officers are trained that it is appropriate to turn their cameras off. (Tr, pp 187, 189.)

Initially, Officer Grubbs claimed in this case that he went to the bathroom at the beginning of his shift and that he toggled his camera off at that time. He claimed that he did not remember to turn his camera back on and that it therefore was off at the time of the encounter with Mr. Blasingame and did not capture any of the events described above. The record, however, conclusively shows otherwise.

Plaintiff introduced into evidence an audit trail of Grubbs's body cam, which documented exactly how Grubbs used his camera on the day in question. Julio Reyes, Jr. has worked in the Atlanta Police Department for over 24 years and trains the department's officers on how to use their cameras (Tr, pp 146-147). He was designated as the person most knowledgeable from the City of Atlanta regarding the body worn camera program (Tr, 156). Examining that audit trail, he testified that Grubbs did indeed turn his camera off at 12:35 p.m., toward the beginning of his

shift  (Tr, pp 238, 244-245).  However, contrary to what Grubbs claimed, he then turned his camera back on at 12:40 p.m.  (Tr, p 248.)  Grubbs's camera was on and in buffering mode when he first saw Mr. Blasingame.   However, at 2:36 p.m., Grubbs toggled his camera *off*.  (Tr, p 252.) It was not turned back on until after Mr. Blasingame was face down at the base of the hill with a broken neck and a crushed skull.  Reyes agreed, relative to the body camera, that it was not even a close call that Grubbs violated Atlanta's policies and his training when he toggled his camera off during these events (Tr, p 181). When asked whether a violation of the body camera policies was a minor matter, he stated:

> No. All of the policies are -- are important. They're there for a purpose, and they have to be followed accordingly. My approach as a trainer is, there is no one policy that is more important than another. They're all important. And they're all of our responsibility to make sure that we're knowledgeable of them and follow them. And that's what we're responsible [sic] for when we sign off on the policies. [Tr, p 160].

Plaintiff's police procedures expert, Dr. Andrew Scott, testified that the encounter with Mr. Blasingame began at roughly 2:36 p.m.  He explained that the entirety of the encounter, from when Grubbs began to approach Mr. Blasingame until the time he used his Taser on him, took less than two minutes.  According to Dr. Scott, Grubbs has his camera on and in buffer mode at the beginning of the encounter. Then, *after* Grubbs used his Taser on Mr. Blasingame, he toggled his camera off, which destroyed the footage of the encounter that would have been stored in buffer mode.  (Tr, pp 468-471.)  Had Grubbs hit the event button instead

of toggling his camera off, as policy required, that footage would have been recorded and maintained.

Multiple witnesses in this case (including Grubbs (TR, p 1076) and Reyes (Tr, p 164)) agreed that the evidence captured by the body camera would have been the best evidence in this case, had it not been destroyed. When asked if that evidence would have been the best evidence of what occurred here, Dr. Scott responded "Without a doubt. That's why Atlanta Police Department and so many other agencies in the United States are using body-worn cameras, because they reflect an unbiased opinion, so to speak, of what transpired." (Tr, p 471)

When considering the circumstances of this case- where Grubbs used his Taser on an elderly homeless man's back without warning while that man was at the top of a hill and running and then deleted the footage of that conduct afterwards- it calls to question whether Grubbs was intentionally covering up his conduct. Reyes, who again is an officer who trains Atlanta's officers, testified that it was possible that Grubbs intentionally turned off the camera to delete evidence (Tr, p 181). He testified that had he been in charge of this investigation, he would have looked into Grubbs's past use of his body camera to determine whether he had a pattern of turning his camera off, but he was not asked to do that by Atlanta (Tr, p 164). He agreed that if Grubbs intentionally destroyed this evidence, it was potentially a

15

criminal act and that if Atlanta truly wanted to ascertain the truth of Grubbs's account, that evidence should have been looked into.  (Tr, pp 183-184.)

Plaintiff's two police procedures experts both agreed with Reyes regarding the significance of Grubbs's destruction of evidence (Defendants offered no expert testimony in this case, leaving the evidence of Plaintiff's highly qualified experts unrebutted. Defendants likewise offered no damage witnesses).  Dr. Scott testified that "the camera should have never been turned off. That -- it leads me to believe that Officer Grubbs intentionally turned the camera off and subsequently erased the buffering, which would have captured the initial contact with Mr. Blasingame and the subsequent foot pursuit and tasing." (Tr, p 581) Plaintiff also had a second police procedures expert, Thomas Tiderington, who testified that

> My conclusion was that the camera was intentionally turned off to erase the event that occurred on this particular day, and then it was turned back on. And, in fact, it happened twice. It happened during the initial encounter with Mr. Blasingame, and then it happened a second time right after Mr. Grubbs asked to use his partner, Officer Shelley's cell phone to make a phone call to his supervisor, he turned the camera off a second time, in my opinion, intentionally turned the camera off a second time. [Tr, p 1118]

Dr. Scott and Mr. Tiderington (as well as other witnesses) each explained the importance of complying with body camera policies.  For context, however, it is essential to understand the deep failings within this department regarding body cameras.  The City of Atlanta performed a department wide audit on body cam usage from November 2017 until May 2018.  It issued a report on that audit in December

16

2018. (Tr, p 266.)  That report, admitted as Trial Exhibit 38, addressed officers' compliance with body cam policies up until two months prior to the events of this case (Tr, pp 267-268). When asked about the audit results, Reyes testified as follows:

> **A.** I can't recall an actual percentage number, but I do recall that the audit findings, their data reported that usage as far as how activation, when the officers are supposed to start their recordings was lower than acceptable.
>
> ***
>
> **Q.** Thank you. In that first paragraph, officers assigned body-worn cameras captured video for 33 percent of officer dispatch calls occurring from November 27 -- excuse me, November 2017 through May 2018. Did I read that right?
>
> **A.** Yes, sir.
>
> **Q.** Police department staff told us they would expect 80 percent of all incidents to have corresponding video. Did I read that right?
>
> **A.** Yes, sir.
>
> **Q.** So 33 percent, folks were using it; is that right?
>
> **A.** Yes, sir.
>
> **Q.** Which means 67 percent of folks, officers, did not?
>
> **A.** Yes, sir. (Tr, pp 269-270)

Reyes then agreed that 2/3 of officers not following department policy shows a pattern (Tr, p 276).  He likewise agreed there is a practice of not following department policy regarding body cameras (Tr, p 276). Further, he agreed there was

17

a custom of officers not using the event button properly and said he was not aware of them being disciplined (Tr, pp 290-291).

Plaintiffs' experts made the significance of the customary body camera policy violations clear. When asked how to explain why the department never looked into why Grubbs lied about his body camera being off, Dr. Scott stated that "I believe that there may be a culture within the organization that intentionally overlooks or dismisses some of the most obvious and blatant policy violations, and as a result, ignore it." (Tr, p 584). When asked if that failure to investigate was an innocent oversight, Dr. Scott said that it couldn't be and that "I think there is a pattern and practice within the agency that allows this to occur." (Tr, p 585). Then, the following exchange occurred:

> **Q.** Do you have an opinion as to whether that indifference of a pattern and practice directly led to this very event?
>
> **A.** Yes.
>
> **Q.** What is your opinion on that?
>
> **A.** Yes. That indifference led to this type of behavior, and further leads to additional types of behavior similarly, because no one's held accountable and management is not doing what they need to do to hold people accountable.
>
> **Q.** How can, in your estimation, this indifference, in pattern and practice, have led to this event, sir?
>
> **A.** Well, a pattern and practice or indifference is generated over a myriad of years. It becomes part of the agency culture not to hold its members accountable and not fully investigating cases of this nature.

18

> And then what happens with that is, it compromises the trustworthiness of the police department to the public. And it occurs over many, many years, and it becomes just a custom. [Tr, p 586]

Then, when asked how a failure to enforce body worn camera policies relates to use of force against the public, Dr. Scott testified

> So if you're not holding your officers accountable, particularly on the most highest duty that an officer is allowed to perform, meaning use of force, then the officers, not only just the officer that is in question, but the officers throughout the rank and file, recognize that there is no consequence to their actions. So if there is no consequences and they're not being held accountable, that means then officers can go off the rail and do what they think they should do when it's not comporting or complying with the agency's policy. It's a very bad formula for disaster to the general public of not adequately keeping your officers accountable for their actions. (Tr, pp 587-588)

Like Dr. Scott, Mr. Tiderington, who has 44 years of law enforcement experience, including 20 years as a chief of police, opined that there was a direct connection between enforcement of body worn camera policies and use of force.

> **A.** There is an absolute connection between the body-worn cameras and the use of force by police officers, in my opinion.

> **Q.** How?

> **A.** It's my experience -- well, first of all, we have to kind of explain what the purpose is of the body-worn cameras, and the purpose of the body-worn cameras is to -- one of the main purposes is to exonerate our police officers who are being accused of misconduct. So oftentimes commanders, police chiefs, we want to view the video to prove that our officer acted properly. And to exonerate any type of false allegation made against our officers. It's my experience that many, many good officers want every second of the event captured on video so they can prove what they did was -- was proper. So they go out of their way to

make sure that the camera is actually videotaping properly, videotaping the events that are occurring there.

**Q.** Okay. And how is that then connected, the camera itself and use of force, Mr. Tiderington?

**A.** As far as how it is connected to the use of force, it's been my experience that the -- once we deploy body-worn cameras at least in my departments and other departments that I'm familiar with, it has reduced the number of citizen complaints made against our officers, and it also has reduced the incidents of use of force that departments experience prior to deploying the cameras. [Tr, pp 1118-1119.]

Then, similarly,

**Q.** Does the use of on-body cameras, if utilized appropriately, can it prevent, if you will, excessive force?

**A.** I believe they do prevent excessive force. (Tr, p 1120)

Mr. Tiderington then explained that it was

very disappointing to see the non-compliance on behalf of a large number of officers within the police department that failed to utilize the cameras appropriately. I think the number was somewhere, somewhere -- to me it was shocking of all of the events captured, only -- of all of the events that occurred, only 60 -- I'm sorry, 30 to 40 percent of the incidents were captured on video, which means 70 percent of the time the officers were not properly, according to policy, utilizing the tools that were provided to them by the City of Atlanta at a great expense to the City of Atlanta. (Tr, p 1122)

### D. Relevant Procedural History

Trial began in this case on Wednesday, August 17, 2022, and continued through Friday, August 26, 2022, when the jury reached their verdict. Of the seven days it took for the parties to put in their proofs, Plaintiff took four days on the issue

20

of liability alone. Plaintiff established through his unrebutted experts, Dr. Andrew Scott and former chief of police (Plaintiffs trial exhibit 60) and Chief Tom Tiderington (Plaintiffs trial exhibit 64), that Defendant Grubbs was unreasonable in his use of lethal force, without warning, on an elderly, fleeing, non-violent, non-felon who posed no threat (Tr. Trans, pp 456, 1147-1148)

At the close of proofs, the parties proceeded to their closing arguments. During Plaintiff's closing, counsel explicitly addressed both compensatory and punitive damages (while only punitive damages are challenged in this motion, compensatory damages are relevant to the applicable analysis as will be discussed in the argument section of this response). First, counsel began by asking for the jury to award Mr. Blasingame $22 million for past and future economic damages, in the form of medical bills already incurred as well as those that would be incurred in the future. Plaintiff then addressed non-economic damages, asking the jury to award Mr. Blasingame $10 million per year, *from each Defendant*, for the prior four years of pain and suffering. Turning to future non-economic damages, Plaintiff likewise requested $10 million per year, *from each Defendant*, for each and every year the jury believed Mr. Blasingame would be alive in the future. Counsel informed the jury that it was for them to decide how long into the future Mr. Blasingame should be awarded damages, while noting that some evidence at trial suggested a period of eight years would be proper while other evidence from the CDC indicated that 14

21

years would be proper.  Using those ranges, that indicates that Plaintiff requested a range of roughly $160 to $280 million in future non-economic damages.  Then, lastly, Plaintiff requested $50 million in punitive damages as to Defendant Grubbs.  In doing so, Plaintiff informed the jury of the applicable standard and argued that Defendant Grubbs showed reckless disregard for Mr. Blasingame and that his ill intent was evident in the destruction of the body cam footage that captured the relevant events.  Thus, in total, Plaintiff argued for an award in the range of $312 million to $432 million. (Tr. Trans. pp 1576-1581.)

Defendants then had their opportunity for their closing argument.  The Court will see that in that closing argument, Defendants did not try to diminish the damages, either economic or non-economic, suffered by Mr. Blasingame. Instead, consider the following passage:

> Should Mr. Blasingame be awarded -- I think it was $100 million for the actions that he engaged in that day? If we were only to look at the consequences and the injuries, maybe. However, if we look at the actions and the consequences, I believe that you will agree with me that he should not. [Tr. Trans. p 1593.]

After Defendant's admission that $100 million was not an unreasonable sum when considering the nature of the damages suffered, counsel argued that such an award would be improper *not because it was monetarily excessive* but because Grubbs did not act unreasonably.  Defendants did not address the subject of punitive damages during their closing.

Following closing arguments, this Court instructed the jurors prior to deliberations. Included in those instructions were thorough descriptions of both compensatory and punitive damages. The Court began by telling the jury that "[i]f you find that Jerry Blasingame has proved more than a minimal physical injury, then you must consider his claims for compensatory and punitive damages." (Tr. Trans. p 1608.) This Court then proceeded to explain the nature, purpose and propriety of compensatory damages. Thus, the jury understood what those damages were designed to do. (Tr. Trans. pp 1608-1609.)

Following the instructions on compensatory damages, the Court instructed the jury on punitive damages. It stated that "Now, ladies and gentlemen of the jury, if you find for plaintiff and find that the defendant Officer Grubbs acted with malice or reckless indifference to Jerry Blasingame's federally-protected rights, the law allows you in your discretion to award plaintiff punitive damages as a punishment for defendant Officer Grubbs and as a deterrent to others." (Tr. Trans. p 1609.) The Court then proceeded to explain that Plaintiff had the burden of proof on punitive damages and also explained the concepts of malice and reckless indifference for the jury so they understood the standard to apply. (Tr. Trans. pp 1609-1610.) Taken together, this was a jury that understood what each category of damages was designed to do, understood Plaintiff had the burden, and knew what Plaintiff had to legally prove to sustain that burden.

23

The jury was then released to deliberate. The first question on the jury verdict form asked the jurors whether "Jerry Blasingame was subjected to excessive or unreasonable force by Defendant Officer Jon Grubbs?" The jury unanimously responded "yes." Question 7 asked the jury whether it found, by a preponderance of the evidence, "That Plaintiff has proved that an official policy or custom of the City of Atlanta was the moving force behind Jerry Blasingame's injuries?" Again, the jury unanimously answered "yes." The jury awarded Plaintiff $60 million in compensatory damages against the City of Atlanta. The jury also found that Mr. Blasingame was "subjected to excessive or unreasonable force by Defendant Officer Jon Grubbs" and accordingly awarded $20 million each in both compensatory and punitive damages against Grubbs.  In total, the jury therefore awarded Plaintiff $100 million- a fraction of the sum requested by Plaintiff and the exact sum that Defense counsel provided to the jury.

Subsequently, Defendants renewed their motion for Judgment as a Matter of Law regarding Plaintiffs' claims against both the City of Atlanta and Defendant Grubbs. This Court ultimately granted the motion as it related to the City's liability (a ruling which is at issue in Plaintiff's pending motions for relief from order pursuant to Fed. R. Civ. P. 60(b)) and denied the motion as it related to Defendant Grubbs.  The Court entered its judgment, consistent with those rulings, on September

22, 2022. On the same day, Defendant Grubbs filed his claim of appeal to the 11th Circuit. At the time of this writing, that appeal remains pending.

On the same day that judgment was entered, September 22, 2022, Defendant Grubbs filed his Notice of Appeal. Then, on December 23, 2022, three months after the judgment was entered, Grubbs filed a motion for relief from judgment, which he stated was pursuant to Fed. R. Civ. P. 60. In that motion, Grubbs sought remittitur and asserted that the jury's verdict was both excessive and unconstitutional. (ECF No. 207.)

Plaintiff responded to Defendant's motion and asserted that it required denial for multiple reasons, both procedural and substantive. Procedurally, Plaintiff explained that a motion seeking remittitur is properly brought pursuant to Fed. R. Civ. P. 50 or 59, depending on the precise nature of the argument. Each of those rules requires the motion to be filed within 28 days of the judgment. Plaintiff argued that Defendant improperly labeled his motion as a Rule 60 motion in order to try to avoid the clear time limits that Defendant had missed. Plaintiff similarly argued that the because Defendant had already filed his notice of appeal, the District Court was divested of jurisdiction and was not permitted to substantively alter the judgment, as Defendant requested. Finally, Plaintiff argued that Defendant's motion was without merit beyond those glaring procedural bars and cited to the trial testimony regarding the nature and extent of Mr. Blasingame's injuries to demonstrate that the jury's

verdict was commensurate to the facts of the case.

The District Court denied Defendant's motion on the basis of the two procedural arguments described above. First, the Court concluded that it did not have jurisdiction over the motion because Defendant had already filed its notice of appeal. Secondly, the Court held that regardless of the jurisdictional concern, Defendant's motion was untimely. The Court found that Defendant's motion was properly seen as a motion pursuant to Fed. R. Civ. P. 59(e), that such a motion had to be filed within 28 days of the entry of judgment and that Defendant failed to meet that deadline. (ECF No. 219.)

As is discussed in Plaintiff's appeal arising from this matter (Case No. 24-12925), after some procedural oddities that resulted in a remand in this case, Defendant Grubbs filed what Plaintiff believes to be an untimely motion for remittitur regarding the award of punitive damages. That motion was granted, reducing the punitive damages from $20 million to $1 million. Having previously negated the $60 million verdict entered against the City of Atlanta (who is vowing to not indemnify Defendant Grubbs despite never firing him or disciplining him for this use of force), the judgment of $21 million dollars is $79 million below what the jury of Mr. Blasingame's peers determined him to be entitled. Defendant Grubbs now seeks to have the remainder of that judgment eliminated. For the reasons set forth below, that request must be denied, as it is entirely devoid of merit.

## STANDARD OF REVIEW

As this Court has previously stated, "[w]e review *de novo* the district court's rulings on motions under Rule 50 of the Federal Rules of Civil Procedure, examining the trial evidence in the light most favorable to the non-moving party." *Doe v Celebrity Cruises, Inc*, 394 F3d 891, 902 (CA 11, 2004). "Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1192 (11th Cir. 2004). In reviewing a motion for judgment as a matter of law, "all evidence and inferences in the light most favorable to the non-moving party to determine whether the evidence presented is so one-sided that reasonable people could not arrive at a contrary verdict." *Id*.

> If the facts and inferences are so strong and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the grant of a directed verdict is proper. If, however, substantial evidence is presented opposed to the motion, and this evidence is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied. [*Walker v. NationsBank N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995) (internal citations omitted).]

## SUMMARY OF ARGUMENT

The District Court properly determined that Defendant Grubbs was not entitled to qualified immunity. An officer is entitled to governmental immunity so long as he or she does not violate a constitutional right of a Plaintiff that was clearly

established at the time of the conduct in question. Here, Grubbs unreasonable use of force violated clearly established constitutional rights that have previously been recognized by this Court. Indeed, Grubbs acknowledged the clearly established nature of this right at trial and has waived not only the availability of qualified immunity in general in this case, but has waived its applicability to the specific facts of this case.

The use of force here was unreasonable and constitutionally excessive. To begin, no use of force was proper in this matter because Grubbs has admitted that he never saw Mr. Blasingame commit any crime and was only attempting to speak with him when Mr. Blasingame began to run. Mr. Blasingame was not under arrest and not being detained. He was free to leave if he chose to and that choice did not entitle Grubbs to utilize any force. Further, when Grubbs chose to use force, the force he used was certainly unreasonable. Under our Supreme Court's authority, determining the reasonableness of force involves an analysis of a variety of factors, including the nature of the crime the subject is suspected of committing, whether that person is armed or dangerous and whether that person poses a threat of harm to the officer or another. Here, Grubbs has admitted that Mr. Blasingame committed no serious crime, was not armed, was not violent, was not threatening and posed no risk of harm. At most, Grubbs alleges that he feared Mr. Blasingame would run int the road if he did not utilize his Taser. Yet, Grubbs explicitly testified at trial that Mr.

Blasingame never entered the road that day and never provided any indication that he would. Indeed, it was Grubbs and Grubbs alone who dangerously ran across multiple lanes of traffic on the day in question.

Not only was the use of force unreasonable, but it was clearly established at the time of these events that Grubbs violated Mr. Blasingame's constitutional rights. As is discussed below, this Court has held (and numerous witnesses at trial agreed), that using a Taser on a subject who is at an elevated height can amount to deadly force. Grubbs admitted at trial that he knew Mr. Blasingame was at the top of the hill when he deployed his Taser, just as he admitted that he could not see the landing zone that Mr. Blasingame would fall into. Grubbs also admitted that deadly force was not permitted under these circumstances. Taken together, Grubbs impermissibly used deadly force against a non-threatening individual who posed no threat of harm to anyone.

## **ARGUMENT**

## I.    **The District Court did not err in denying Defendant's assertion of qualified immunity**

Defendant first argues that the District Court erred in concluding that he was not entitled to qualified immunity relative to his use of force toward Mr. Blasingame. As this Circuit has explained, "[u]nder the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established

federal statutory or constitutional rights of which a reasonable person would have known." Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999). Here, Defendant asserts that immunity is proper because he did not violate Mr. Blasingame's constitutional rights and, to the extent he did, those rights were not clearly established at the time of these events. Each of those arguments was properly rejected by the District Court, which Plaintiff will discuss in turn.

As an initial matter before the qualified immunity analysis, Plaintiff reiterates what is stated in the standard of review above- Defendant is obligated to demonstrate why his motion should have been granted even when taking the evidence in the light most favorable to Plaintiff. Knowing that standard, Defendant has provided this Court with a brief on appeal that barely scratches the surface when it describes the testimony at trial relative to the issues on appeal. There was overwhelming evidence presented at trial as to the unreasonableness of Grubbs's use of force. Defendant's decision to ignore that evidence despite having the burden on appeal does a disservice to the gravity of this case. More importantly, it precludes Defendant from obtaining the relief he seeks.

## A. Defendant has waived the qualified immunity defense

Prior to addressing the lack of merit in Defendant's assertion of qualified immunity on substantive grounds, Plaintiff first asserts that this Court should deem the defense to have been waived. As the United States Supreme Court has explained,

"Qualified immunity questions should be resolved at the earliest possible stage of the litigation." *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034, 3042, 97 L. Ed. 2d 523 (1987). That rule exists because the defense of qualified immunity is an immunity from suit, as opposed to just a defense to liability. The benefit of the defense is thus effectively lost if a case proceeds to trial. *Mitchell v. Forsyth*, 105 S. Ct. 2806, 472 U.S. 511, 86 L. Ed. 2d 411 (1985). As a result, the 11th Circuit has explained that a Court should typically resolve qualified immunity questions prior to trial in either a motion for failure to state a claim, a motion for judgment on the pleadings, or a motion for summary judgment. *Ansley v. Heinrich*, 925 F.2d 1339 (11th Cir. 1991).

Here, Defendant first raised the argument that he was entitled to qualified immunity on August 24, 2022, which was the fifth day of trial (Tr, p 1457). In response, the District Court explicitly asked defense counsel "[i]f you-all thought it was qualified immunity, why did you-all not file a motion to dismiss at the summary motion stage?" (Tr, p 1457.) To that, defense counsel had no real response, merely asserting that "I can't really answer that." (Tr, p 1457.) The District Court essentially elected to not rule on the issue at that stage. Then, when Defendants brought their motion for JMOL following trial, the District Court denied the assertion of qualified immunity, correctly holding that Defendant Grubbs violated Plaintiff's clearly established constitutional rights under the 4th Amendment.

While the District Court was correct that Grubbs was not entitled to qualified immunity based on the facts of this case and the applicable case law, the District Court (and this Court) should have precluded Grubbs from raising the defense at trial. Again, as Anderson and Mitchell both explain, qualified immunity should be asserted as early as possible and should be determined well in advance of trial through the motion process. Here, the issue was not decided until trial was done. Defendant was thus not utilizing qualified immunity as it was envisioned to be applied (to avoid trial where one would not be justified) but was instead using it for the improper purpose of negating a jury's determination that was based on an extensive evidentiary record and a proper instruction regarding the applicable law.

## B. This use of force was unreasonable and excessive under the governing standards

Even if this Court were to consider the merits of the qualified immunity question, Defendant Grubbs is still not entitled to relief. The right to be free from excessive force is guaranteed by the Fourth Amendment's protections against unreasonable seizures. *See* U.S. Const. amend. IV; *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989). The Supreme Court in *Tennessee v. Garner* established that a police officer's use of deadly force is a "seizure" within the meaning of the Fourth Amendment and that claims alleging the use of such force are evaluated under the Fourth Amendment's reasonableness standard. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Under that standard, "the question is whether the officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.

Determining whether the use of force is reasonable requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Garner*, 471 U.S. at 8.  The Supreme Court instructed that courts should weigh "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).  As the 11th Circuit has recently explained in an opinion that will be discussed extensively below,

> When an officer uses deadly force, we must also consider whether the officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.  [*Bradley v Benton*, 10 F.4th 1232, 1240-1241 (2021) (internal quotations and citations omitted).]Here, a binding opinion issued by the 11th Circuit within the last year demonstrates that the use of force in this case was not permissible.  In *Bradley*, the Plaintiff was a passenger in a vehicle that was pulled over in a traffic stop.  After interacting with the driver of the vehicle, the officers turned their attention to the Plaintiff.  When the Defendant officer asked a different officer at the scene to run the Plaintiff's name through the department's system, the Plaintiff exited the vehicle and fled on foot.  He ultimately found himself situated atop of a concrete wall that was roughly eight feet tall.  *Id*. at 1236.  Evidence indicated that the Defendant deployed his taser and struck the Plaintiff

while he was atop the wall, causing the Plaintiff to fall.  *Id*. at 1240.
Upon falling, Plaintiff suffered blunt force trauma to his head and neck,
dying as a result.  *Id*. at 1236.

In concluding that the Defendant was not entitled to qualified immunity relative to the Plaintiff's claim for excessive force under the 4th Amendment, the 11th Circuit explained that while a taser is *generally* not classified as a deadly weapon, it may nonetheless be applied in a way that results in deadly force.  *Id*. at 1241.  The *Bradley* Court thus clarified that "As relevant here, we join many other courts that have recognized that tasing a person who is at an elevated height may come with a substantial risk of serious bodily harm or death."  *Id*.  As described in the statement of facts, there was not a single witness at trial, including Defendant Grubbs, who denied the risk of serious injury or death that exists when tasing an individual who is at an elevated height.

After acknowledging that tasing someone who is at an elevated height can be properly classified as lethal force (and is so classified in many other courts), the Court determined that the Defendant's "decision to use this level of force was not reasonable under these circumstances."  Note, the Court did not state that a reasonable jury could *perhaps* conclude that the use of force was not reasonable. Rather, it appears the Court determined that the *only* permissible conclusion was that the use of force was unreasonable. The same is true here, and for the same reasons as in *Bradley*.

The *Bradley* Court specified that the use of force was unreasonable "for three reasons." *Id*. at 1241. First, where the Plaintiff was unarmed, never made any threatening gesture and never demonstrated that he posed any danger at all, the Court found that the Defendant "lacked probable cause to believe that Robinson posed a threat of serious physical harm to anyone." *Id*. at 1241-1242. Here, Plaintiff likewise was unarmed, likewise never threated anybody and likewise never posed any danger at all. Again, Grubbs admitted each of those facts at trial.

Second, the *Bradley* Court noted that the Defendant did not have probable cause to conclude that the Plaintiff had committed a crime that involved either actual or threatened serious physical harm. Again, the same is true here. Plaintiff had not committed, or threatened to commit, *any* crime of violence, let alone an act that would cause the serious physical violence that would justify the use of deadly force. Moreover, Grubbs admitted that he did not see Mr. Blasingame commit any crime at all and that he was merely attempting to talk to him. He admitted, similarly, that he had zero intention of arresting Mr. Blasingame when he approached him initially.

Third, the *Bradley* Court found that the Defendant officer fired his taser at the Plaintiff without giving a warning, despite having the opportunity to do so. *Id*. at 1242. Again, the present case is no different. Plaintiff was never warned that he was going to be subjected to any force at all, let alone lethal force. Grubbs admitted in trial that he never warned Mr. Blasingame before he fired his taser.

35

As is demonstrated by the binding case law cited above, using a taser on someone while they are at an elevated height amounts to deadly force. Where an officer uses that particular type of deadly force 1.) without probable cause that the target poses a threat of serious physical harm to another, 2.) without probable cause that the target had already committed a crime involving either actual or threatened serious physical harm and 3.) without giving the target warning before using force, the 11th Circuit has established that no reasonable finder of fact could conclude that the use or fore was constitutionally permissible.

In addition to *Bradley* irrefutably demonstrating that the use of force here was excessive, Plaintiffs presented expert testimony from both Dr. Andrew Scott and Chief Tom Tiderington. Each of those highly qualified witnesses (who have roughly 80 years in combined law enforcement experience) testified that no amount of force was permissible under these circumstances where Mr. Blasingame was suspected of no crime, posed no threat, possessed no weapon and acted with no aggression. Further, the jurors observed the testimony of Officer Grubbs and considered his account of these events in the context of the totality of the evidence. Their verdict plainly demonstrates their conclusions.

"When the resolution of the case boils down to credibility, the trial judge must allow the jury to function." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558 (11th Cir. 1984). And again, in the context of a motion for judgment as a matter of law, if

36

"substantial evidence is presented opposed to the motion, and this evidence is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Walker*, 53 F.3d at 1555 (internal citations omitted). Plaintiff had the burden of showing that Grubbs used unreasonable and excessive force that was unnecessary under the circumstance he faced. The evidence in this case satisfied each of those elements and, quite frankly, it is not a remotely close question.

In moving orally for judgment as a matter of law and then renewing that oral motion in a cursory document one paragraph in length, Defendant did nothing to address *Bradley* or the evidence presented in this case. Then, despite knowing that the District Court already denied this motion when it was initially brought, Defendant renewed his motion despite nothing materially changing in the remainder of the trial and despite not presenting any analogous authority that demonstrates the initial denial was incorrect. The Court properly denied this motion and Defendants have done nothing to show otherwise.

### C. The use of force violated a clearly established constitutional right

After concluding that the use of force at issue was per se unreasonable and unconstitutional, the *Bradley* Court addressed whether that right was clearly established at the time of the underlying use of force. While the 11th Circuit noted that litigants generally need to establish the constitutional right at issue with a

37

sufficient level of specificity to avoid an application of qualified immunity, it held that the Plaintiff in *Bradley* had no difficulty making that showing.  The Court stated that

> *Garner* clearly established that an officer cannot use deadly force to stop an unarmed man who is not suspected of committing a violent crime from fleeing on foot. That is precisely what happened in *Garner* and that is precisely what happened in this case. Accordingly, *Garner* put Officer Benton on notice that he could not use deadly force to stop Robinson from running away on foot.

Just as what the Defendant officer did in *Bradley* was precisely covered by the seminal decision in *Garner*, so too was Defendant Grubbs's conduct in the present case.  Mr. Blasingame was an unarmed man, suspected of no violent crime who was the target of deadly force merely because of his decision to flee on foot. To the extent that Defendant Grubbs wishes to argue that he had no awareness that the taser could be deadly in these circumstances, his only way to do so is to deny the extensive training he allegedly received regarding his use of taser. That training was a basis of the City of Atlanta's motion for judgment as a matter of law regarding Plaintiff's municipal liability claim. Thus, Defendants were asking the District Court to simultaneously conclude that Grubbs was well-trained on how to safely and constitutionally use his taser but that he also had no awareness that he was using his taser in a deadly manner despite his training to the contrary about environmental considerations.

Further, not only did the *Bradley* Court establish that the conduct in this case is directly covered by the *Garner* holding, but it also establishes that the use of force was so obviously unconstitutional that Grubbs would have been aware of that fact regardless of an analogous decision. Consider the below passage:

> Second, we would conclude that the use of force here was obviously unconstitutional even absent a case directly on point. Robinson posed no immediate threat to Officer Benton. He never tried to harm any of the officers, nor did he make any threatening movements or gestures. The officers also had no reason to think he posed a threat to anyone in the apartment complex, which he had just left. He was not suspected of committing a crime involving the infliction of serious physical harm. He was not even the suspect of the traffic stop, which was conducted on the suspicion that Sims was driving with an illegal tag. Yet, without any warning, Officer Benton applied deadly force to prevent Robinson's escape from the traffic stop on foot. We conclude that no reasonable officer could have believed that the application of deadly force was warranted under these circumstances.

Again, all of that is equally true here, particularly when one applies the judgment as a matter of law standard and takes the evidence in the light most favorable to Plaintiff.

Notably, when Defendant first indicated that he believed immunity was appropriate (on day five of trial), he did *not* dispute that it was clearly established that tasing Mr. Blasingame while he was in an elevated position would violate the constitution. He conceded that point, but merely argued that Grubbs did not know that Mr. Blasingame was in such a position. Consider the following passage:

39

THE COURT: Let me ask you two questions here. I'm familiar
with the Bradley case. Judge Pannell in this Court handled that case.
Judge Brasher did say in that case that it is clearly a Constitutional
violation to tase somebody at a height, elevated height.

MR. DEARING: Sure. But, Your Honor, that goes to the fact that
the evidence came out that they never clearly established that Officer
Grubbs knew the situation.

Thus, Defendants' argument was not that what Grubbs did was not a legal argument

that what Grubbs did was constitutionally permissible, but was instead a factual

argument about his level of knowledge.  That argument was properly submitted to,

and decided by the jury, which heard testimony from Grubbs in which he stated that

he knew Mr. Blasingame was on an elevated surface:

**Q.** You knew as you deployed, of course, that you were on an
elevated surface; correct?

**A.** Yes.

**Q.** You knew he was running away from you; correct?

**A.** Yes.

**Q.** So and running downhill; right?

**A.** Yes. (Tr, p 1074)

Defense counsel admitted at trial that it was clearly established that tasing

someone while knowing they were on an elevated surface violated the constitution

(thus also waiving this aspect of their qualified immunity argument), and Plaintiff

elicited testimony showing that Defendant Grubbs did just that.  There is no basis on

which he can now be granted the (waived) defense of qualified immunity without improperly assuming the role of finder of fact and determiner of credibility. This appeal has no merit.

## **<u>CONCLUSION</u>**

Mr. Blasingame has had his life forever destroyed by an Officer who used deadly force on him without an inkling of justification and who then destroyed the evidence of his misconduct. Despite his destruction of that evidence, there can be no doubt that he violated Mr. Blasingame's clearly established constitutional rights that day. As the evidence at trial overwhelmingly showed, Grubbs elected to use violate standard after standard when he tasered an elderly man without warning as that man was running and was situated at the top of a hill. Grubbs used deadly force despite admitting that Mr. Blasingame posed no threat to him or anyone else. This Circuit has established that Grubbs knew such conduct violated the constitution. The District Court properly determined Grubbs was not entitled to immunity, which Grubbs further waived by virtue of not timely asserting. Defendant is not entitled to any relief on appeal.

Respectfully submitted,

*/s/ Christopher P. Desmond*
Christopher P. Desmond (P71493)
Ven Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
Tel: (313) 324-8300
cdesmond@venjohnsonlaw.com

Dated: January 10, 2025          *Counsel for Plaintiff-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type-volume limitation provided in F.R.A.P. 32(a)(7)(B). The foregoing brief contains 10,111 words of Times New Roman (14 point) proportionate type.

*/s/ Christopher P. Desmond*

Christopher P. Desmond (P71493)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 10, 2025, I electronically filed the foregoing paper with the Clerk of the Court using ECF system which will send notification of such filing to all counsel of record in this matter.

<u>/s/ Christopher P. Desmond</u>